# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| KATHY L. THOMPSON, | ) |  |
|---|---|---|
| Plaintiff, | ) |  |
| v. | ) | CAUSE NO. 1:08-CV-00234 |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | ) |  |
| Defendant. | ) |  |

## OPINION AND ORDER

Plaintiff Kathy Thompson appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

Thompson initially applied for SSI and DIB in the fall of 2004, alleging that she became disabled as of December 20, 1998. (Tr. 73, 553.) Her date last insured for DIB was December 31, 2005.[2] (Tr. 97.)

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

[2] Thompson must establish that she was disabled as of that date for purposes of her DIB claim. *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997). However, it is not necessary to do so with respect to her SSI claim. (Tr. 712); *see, e.g.*, *Andresen v. Chater*, No. 96 C 1997 WL 223061, at *5 (N.D. Ill. Apr. 28, 1997) (citing *Eads v.*

After the Commissioner denied Thompson's application initially and upon reconsideration, she requested an administrative hearing. (Tr. 550, 564.) A hearing was conducted by Administrative Law Judge ("ALJ") Paul Armstrong on November 29, 2005, at which Thompson (who was represented by counsel), a medical expert, and a vocational expert ("VE") testified. (Tr. 672-709.) On February 2, 2006, the ALJ rendered an unfavorable decision to Thompson. (Tr. 553-63.) However, the Appeals Council ultimately vacated the hearing decision and remanded the case to an ALJ because the hearing recording was partially inaudible and because the ALJ failed to discuss the testimony of the medical expert in his decision. (Tr. 539-40.)

Upon remand, a second hearing was conducted by ALJ Steven Neary on April 13, 2007, at which Thompson (who was represented by counsel), her daughter, and a VE testified. (Tr. 710-30.) On September 19, 2007, the ALJ rendered a second unfavorable decision to Thompson, concluding that she was not disabled because she could perform a significant number of jobs in the economy despite the limitations caused by her impairments. (Tr. 22-33.) This time the Appeals Council denied Thompson's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 7-9.) Thompson filed a complaint with this Court on October 9, 2008, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II. THOMPSON'S ARGUMENTS

Thompson alleges three flaws with the Commissioner's final decision. Specifically, Thompson claims that the ALJ (1) made an erroneous residual functional capacity ("RFC") finding because he failed to consider all of her impairments in combination; (2) improperly

---

*Sec'y of Dept. of Health & Human Servs.*, 983 F.2d 815, 816 (7th Cir. 1993)).

determined that her testimony of debilitating limitations was "not entirely credible"; and (3) made an improper step five finding based on incomplete hypotheticals and citing an insignificant number of jobs in the economy. (Pl.'s Mem. in Supp. of Summ. J. or Remand ("Opening Br.") 15-17.)

### III. FACTUAL BACKGROUND[3]

*A. Background*

At the time of the ALJ's final decision, Thompson was forty-nine years old; had a ninth or tenth grade education; and possessed work experience as a warehouse high lift operator and warehouse worker. (Tr. 73, 90, 101, 106.) Thompson alleges that she became disabled as of December 20, 1998, due to osteoarthritis, morbid obesity, diabetes mellitus, and depression and anxiety. (Tr. 73; Opening Br. 2.)

*B. Thompson's Testimony at the Hearing*

At the second hearing, Thompson, who was 5'5" and weighed 295 pounds, testified that she lives alone but that her adult daughter was staying with her currently. (Tr. 713.) She reported that she is independent with her self care, although she has difficulty getting in and out of the bathtub, and she prepares her own meals. (Tr. 717.) In describing her typical day, Thompson stated that she intersperses the performance of light household tasks with her need to frequently sit and elevate her legs, and that she enjoys watching television for leisure. (Tr. 716-18, 720.) She reported that she drives a car to make "quick trips" to the grocery and to visit her sister. (Tr. 718.)

When asked to describe her symptoms, Thompson explained that her ankles "swell up"

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 730-page administrative record necessary to the decision.

and "ache something awful", reporting that they "throb" even when she elevates her feet and that the pain interferes with her sleeping. (Tr. 715-16, 722-23.) She stated that she can stand for no more than ten or fifteen minutes at a time and that she "do[es] not] walk much", ambulating less than one block at a time. (Tr. 716.) She also reported that sometimes her ankles "go[] out" with no warning, causing her to stumble, and that her right hand "go[es] numb a lot". (Tr. 717-18.) Thompson testified, however, that she has no difficulty with sitting, providing that she can prop her feet up. (Tr. 716, 720.) As to lifting, she stated that she can lift a gallon of milk, as long as she does not have to hold it for a period of time. (Tr. 717.) Thompson also complained that she is forgetful, has bouts of depression, and experiences anxiety attacks.[4] (Tr. 718, 721-22.)

### C. *Summary of the Relevant Medical Evidence*

In December 1995, Thompson underwent tarsal tunnel decompression surgery and physical therapy. (Tr. 158-59.) Two years later, in February 1998, Thompson was seen at LaPorte Hospital for bilateral ankle pain and swelling, and a cyst was found on her tibial nerve; x-rays revealed mild degenerative joint disease of the mid-tarsal joint bilaterally. (Tr. 147, 154.) Thompson then underwent a release of the tarsal tunnel bilaterally with removal of the cyst. (Tr. 150.)

In June 1998, Thompson visited Dr. Valerie Maguire for problems with her right hand. (Tr. 172, 325-26.) Examination revealed erythema and tenderness, and Dr. Maguire assessed that Thompson had either tenosynovitis or a second metacarpophalangeal joint infection. (Tr. 172, 325-26.)

---

[4] Thompson's daughter testified at the second hearing on Thompson's behalf, essentially corroborating her testimony. (Tr. 723-25.)

On March 3, 1999, Thompson was examined by Dr. M. Zeitoun at the request of the state agency. (Tr. 181-84.) Examination revealed that Thompson was obese, had blood pressure of 170/100, and had decreased range of motion in her hips, knees, and left ankle. (Tr. 182-83.) Dr. Zeitoun diagnosed her with status post tarsal tunnel release bilateral feet with residual severe pain, chronic headaches, and hypertension. (Tr. 183.)

One month later, Dr. L. Bastnagel, a state agency physician, reviewed Thompson's record and concluded that she could carry twenty-five pounds frequently and fifty pounds occasionally; stand for four hours and sit for six hours in an eight-hour period; and occasionally climb, balance, stoop, kneel, crouch, or crawl. (Tr. 187-94.)

Also in 1999, Thompson was treated by Dr. Daniel Edquist, a general practitioner, every few months for headaches, panic attacks and depressive symptoms, and elevated blood pressure; he prescribed her Paxil. (Tr. 169-71, 459-66.) On September 20, 2000, Dr. Edquist saw Thompson for pain and unsteadiness in her right knee. (Tr. 455.)

On August 28, 2001, Thompson underwent a psychosocial evaluation at Madison Center, and she was diagnosed with depression. (Tr. 229-42, 253-63.) She then participated in individual counseling for her depression once a week through March 2002. (Tr. 195-244.)

In January 2002, Thompson visited Dr. Edquist for her anxiety and depression. (Tr. 444.) He also assessed her with elevated blood sugar, obesity, and borderline hypertension. (Tr. 444.)

On September 4, 2003, Thompson was evaluated by Dr. Tim O'Connor for her right knee problems and headaches. (Tr. 319.) After examination revealed antalgic gait and medial joint tenderness, he diagnosed her with degenerative joint disease of the knee. (Tr. 319.)

Thompson was seen by Dr. Edquist on a monthly basis from October 2003 through

September 2004 for persistent knee pain, morbid obesity, diabetes, and anxiety and depression. (Tr. 351-64, 440-45.) He also noted that she complained of dizzy spells, difficulty concentrating, irritability, and sleep disturbances. (Tr. 351-64.)

In June 2004, Dr. John Halstead evaluated Thompson for right knee discomfort. (Tr. 314.) Upon examination, he noted that she was overweight and experienced swelling, mild tenderness, and questionable effusion of her right knee. (Tr. 314.) He diagnosed her with early degenerative arthritis of the right knee and strongly encouraged her to lose weight. (Tr. 314.)

In September 2004, Thompson was admitted to LaPorte Hospital due to complaints of chest pain, nausea, and shortness of breath. (Tr. 342.) She was diagnosed with diabetes mellitus, obesity, hypertension, chest pain not cardiac in nature, and headache syndrome. (Tr. 328-49.)

On December 27, 2004, Thompson was examined by Dr. Ralph Inabnit of the New Carlisle Medical Group. (Tr. 370-81.) He diagnosed her with diabetes mellitus, type II; morbid obesity; hypertension; hyperlipidemia; chronic headaches; fatigue, dizziness; osteoarthritis of the right knee; syncopal episodes; "GERD", and anxiety and depression by history. (Tr. 381.)

Thompson saw Dr. Edquist again in December 2004 and January 2005. (Tr. 384, 387.) He noted that fatigue seemed to be her primary problem. (Tr. 384, 387.)

On January 20, 2005, Dr. F. Montoya, a state agency physician, reviewed Thompson's record and opined that she could carry twenty-five pounds frequently and fifty pounds occasionally; stand for six hours and sit for six hours in an eight-hour period; and occasionally balance, stoop, kneel, crouch, and crawl but never climb ramps/stairs. (Tr. 479-86.) He also stated that she was limited in pushing and pulling with her lower extremities. (Tr. 480.)

On March 15, 2005, R. Klion, Ph.D., reviewed Thompson's record and completed a

6

psychiatric review technique form, concluding that she had mild restrictions in activities of daily living, but no episodes of decompensation and no functional limitations in maintaining concentration, persistence, pace, or social functioning. (Tr. 487-97.)

On May 2, 2005, Dr. Edquist completed a medical source statement, opining that Thompson was limited to carrying less then ten pounds occasionally; standing less than two hours in an eight-hour period; and occasionally kneeling but never climbing, crawling, or stooping. (Tr. 500-05.) He reflected that she was unlimited in handling, fingering, and feeling with her upper extremities; that she was "somewhat" limited in sitting; and that her ability to push and pull was limited in her lower extremities. (Tr. 503-04.) When asked what clinical findings support these limitations, Dr. Edquist stated that Thompson had multiple surgeries on her ankles and that she had reported these limitations to him. (Tr. 504-05.)

Thompson was seen several more times in 2005 by Dr. Edquist for her diabetes, high blood pressure, depression, and left ankle pain. (Tr. 603-14.) He noted that her ankle problems made it difficult for her to stand or walk and that her weight had increased due to her lack of mobility. (Tr. 603-14.)

In May and September 2005, Thompson was seen by Dr. Halstead for her right knee discomfort, left ankle pain, and right hand intermittent pain and numbness. (Tr. 514.) He recommended that she wear wrist braces and consider having an EMG if her symptoms continued. (Tr. 514.) On November 30, 2005, Dr. Halstead wrote a letter "To whom it may concern", recommending that Thompson be evaluated by a subspecialty orthopedist for her left ankle pain and that she "would be allowed to do sedentary work." (Tr. 511.) The next day Dr. Halstead added the following handwritten notation to the letter: "Elevate legs prn." (Tr. 511.)

7

On December 5, 2005, Thompson was evaluated by Dr. Scott Karr, an orthopaedic surgeon, for her ankle pain and instability. (Tr. 662-63.) Dr. Karr's examination revealed instability of both ankles, and on January 31, 2006, Dr. Karr performed a left ankle secondary reconstruction. (Tr. 661, 657-60.)

On April 24, 2006, Thompson underwent a psychological evaluation by Nancy Link, Psy.D. (Tr. 615.) Dr. Link found that Thompson's mood was depressed and anxious with congruent affect, that her attention was limited to less than fifteen minutes, and that she had prior suicidal ideations. (Tr. 617.) She concluded that Thompson could manage her own funds but had moderate difficulty with customary activities and daily living skills, and moderate impairment in work-related activities. (Tr. 619.) She diagnosed her with panic disorder with agoraphobia and depressive disorder, assigning her a General Assessment of Functioning ("GAF") score of 59, indicating a moderate functional impairment.[5] (Tr. 619.)

On April 25, 2006, Dr. Jonathan Sands, a state agency physician, reviewed Thompson's record and concluded that she could lift ten pounds frequently and twenty pounds occasionally; stand for six hours and sit for six hours in an eight-hour period; and occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 620-27.) The next day, William Shipley, Ph.D., reviewed Thompson's record and opined that as a result of her psychological impairments, Thompson had mild limitations in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. 628-40.)

---

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

On May 25, 2007, Dr. Edquist completed another medical source statement and limited Thompson to carrying less then ten pounds occasionally; standing less than two hours in an eight-hour period; sitting less than two hours in an eight-hour period; and occasionally handling, fingering, and feeling, but never climbing, kneeling, crouching, crawling, or stooping. (Tr. 668-71.) He also opined that she was limited in pushing or pulling with her upper and lower extremities. (Tr. 669.)

## IV. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

9

## V. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the

---

[6] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

Commissioner. *Clifford*, 227 F.3d at 868.

## B. *The ALJ's Decision*

On September 19, 2007, the ALJ rendered his opinion. (Tr. 22-33.) He found at step one of the five-step analysis that Thompson had not engaged in substantial gainful activity since her alleged onset date. (Tr. 25.) At step two, the ALJ concluded that Thompson had the following severe impairments: degenerative arthritis of the right knee, bilateral ankle pain and instability status post surgeries, and obesity. (Tr. 25.) At step three, the ALJ determined that Thompson's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 27.) Before proceeding to step four, the ALJ determined that Thompson's testimony of debilitating limitations was "not entirely credible" and that she had the following RFC:

> [T]he claimant has the residual functional capacity to perform sedentary work . . . except no work that requires climbing, crawling or kneeling, no outside work in cold or wet weather, and only occasional stooping, balancing and crouching.

(Tr. 27.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Thompson was unable to perform any of her past relevant work. (Tr. 32.) The ALJ then concluded at step five that Thompson could perform a significant number of jobs within the economy, including taper or printed circuit layout, escort vehicle driver, charge account clerk, and document preparer-microfilming. (Tr. 33.) Therefore, Thompson's claims for DIB and SSI were denied. (Tr. 33.)

## C. *A Remand of the ALJ's RFC Finding Is Warranted*

Thompson first argues that the ALJ erred when determining her RFC by failing to consider the effects of her non-severe impairments – that is, her depression, anxiety, diabetes,

11

hypertension, headaches, and right hand pain – in combination with her severe impairments. While Thompson challenges the RFC on several fronts, at least one of her contentions has merit and warrants a remand of the Commissioner's final decision.

The RFC is a determination of the tasks a claimant can do despite her limitations. *See* SSR 82-62. While the RFC can be expressed in terms of exertional categories such as "light", medium", or "heavy", the ALJ must first make a more detailed function-by-function assessment of the claimant's current physical and mental abilities. SSR 96-8p. The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of a lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p; *see* 20 C.F.R. §§ 404.1545, 416.945. In doing so, an ALJ must consider the combined effect of a claimant's severe and non-severe impairments when assigning an RFC. *See* 20 C.F.R. §§ 404.1523, 416.923; *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005); *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004); *Clifford*, 227 F.3d at 873 (7th Cir. 2000); *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000).

Thompson argues, among other things, that the ALJ erred when determining her RFC by ignoring the findings of Dr. Link, a psychologist who examined her at the request of the state agency, concerning her functional limitations arising from her mental impairment. Specifically, Dr. Link opined that Thompson had moderate difficulty in performing her customary and daily activities and a moderate impairment in work activities. On that same front, Dr. Link assigned Thompson a GAF of 59, which is indicative of moderate symptoms arising from a mental health

impairment. The ALJ did indeed mischaracterize the record in this respect.

To explain, in discussing Dr. Link's evaluation, the ALJ never mentioned the functional limitations that she assigned:

> In April 2006, [Thompson] had a psychological evaluation by Nancy Link, Psy.D., at the request of the Social Security Administration. Dr. Link noted that the claimant described some symptoms of depression, and also described having panic attacks and anxiety being in places where escape might be difficult. She diagnosed depressive disorder NOS and panic disorder with agoraphobia.

(Tr. 26.) Of course, the ALJ's failure to expressly mention Dr. Link's limitations, standing alone, is not necessarily pivotal as an ALJ "need not provide a written evaluation of every piece of evidence that is presented", *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004), as long as the reviewing court is able to trace the ALJ's path of reasoning, *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).

Yet here the ALJ's path of reasoning is flawed. The ALJ relied, at least in part, upon the reviewing state agency psychologists' opinions that Thompson had only "mild" deficits *because he thought there was no other opinion of record addressing her mental functional limitations*.[7] The ALJ, however, apparently overlooked Dr. Link's opinion that Thompson had moderate functional deficits, evidenced by the following statement:

> In making this finding, the undersigned [ALJ] agrees with the assessments of

---

[7] The ALJ also observed that (1) Thompson had never sought the treatment of a psychiatrist for her depression, but relied solely upon her primary care physician, Dr. Edquist, to manage her anti-depressant medications; (2) she discontinued the anti-depressants for periods of time on her own accord; and (3) Dr. Edquist noted improvement in Thompson's mental health symptoms when she took the anti-depressants. (Tr. 26.) Of course, "it is questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Seamon v. Barnhart*, No. 05-C-13-C, 2005 WL 1801406, at *19-20 (W.D. Wis. July 29, 2005) (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)). "Courts have long recognized the inherent unfairness of placing emphasis on a claimant's failure to seek psychiatric treatment[.]" *Sparks v. Barnhart*, 434 F. Supp. 2d 1128, 1135 (N.D. Ala. 2006).

13

> several State agency psychologists who have evaluated the evidence of record. *There is no medical opinion from a treating or examining source regarding the claimant's mental functional limits*.

(Tr. 27 (emphasis added)); *see generally Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (opining that when probative evidence is left unmentioned by the ALJ, the court is left to wonder whether it was even considered).

"[W]hen the record contains conflicting medical evidence, the ALJ has an affirmative responsibility to resolve that conflict." *Bailey v. Barnhart*, 473 F. Supp. 2d 842, 849 (N.D. Ill. 2006) (citing *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)); *see Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (remanding ALJ's decision where "[t]he chief problem lies in the ALJ's mischaracterization of the medical evidence"). Notably here, Dr. Link was the only mental health specialist of record to examine Thompson and administer a psychological evaluation. *See generally Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice.").

Moreover, Dr. Shipley, one of the state agency psychologists upon whom the ALJ relied, made the same mischaracterization, which is likely where the ALJ's oversight originated. Dr. Shipley stated:

> The claimant was referred to Dr. Nancy Link for an evaluation who diagnosed panic disorder with agoraphobia and depressive disorder. *The consultant did not give any medical opinions in regard to functional limitations nor is there any other medical opinion in file.*

(Tr. 640 (emphasis added).) Therefore, at least some of the evidence upon which the ALJ rests his RFC is seemingly flawed. *See generally Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (emphasizing that the court will only uphold an ALJ's decision if it is supported by

14

substantial evidence).

The Commissioner, however, asserts that the ALJ's mis-step is harmless. *Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination). In advancing this argument, the Commissioner points to the ALJ's statement later in his decision that the jobs identified by the VE would also accommodate Thompson's functional limitations arising from her mental impairment even if her limitations were more than mild. Specifically, the ALJ stated:

> Even if the claimant's mental impairments caused more than minimal limitations in the area of concentration, persistence and pace, the appropriate addition to the residual functional capacity would be a restriction to simple, repetitive tasks. The undersigned notes, however, that occupations identified below by the vocational expert at Step 5 of the sequential evaluation are unskilled work, and therefore would accommodate such a restriction.

(Tr. 32.)

However, whether a moderate deficit in concentration, persistence, or pace is adequately accommodated by a limitation to simple, repetitive tasks is not particularly well-settled. *Compare Simila v. Astrue*, 573 F.3d 503, 521-22 (7th Cir. 2009) (acknowledging its prior holding that claimants who are mildly or moderately limited in concentration, persistence, or pace are able to perform simple and repetitive light work), *with Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009) (concluding in the context of a fee petition that the Commissioner's argument was not substantially justified where it defended the ALJ's limitation of the claimant to "simple" tasks as an accommodation for moderate deficits in concentration, persistence, or pace). At the end of the day, the Commissioner bears the burden at step five, not Thompson*, Clifford*, 227 F.3d at 868, and any hypothetical posed to a VE "must include *all* limitations supported by medical evidence in the record." *Stewart*, 561 F.3d at 684 (emphasis added); *Steele*, 290 F.3d at

15

942 (7th Cir. 2002) (remanding case where the hypothetical posed to the VE failed to address how claimant's depression restricted his daily activities, social functioning, and ability to timely complete tasks).

As a result, this Court cannot definitively conclude that the ALJ's mischaracterization of the record concerning the functional limitations opined by Dr. Link is mere harmless error. *Shramek*, 226 F.3d at 814. Consequently, the Commissioner's final decision will be remanded so that the ALJ may re-examine the medical evidence of record concerning Thompson's functional deficits arising from her mental impairments, resolve all conflicts, and if necessary, re-evaluate her RFC.[8]

## VI. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion. The Clerk is directed to enter a judgment in favor of Thompson and against the Commissioner.

SO ORDERED.

Enter for this 1st day of September, 2009.

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge

---

[8] Because a remand is warranted on Thompson's first argument, the Court need not reach her remaining arguments.